UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JOSEPH P. NORELLI, Regional
Director of Region 20 of the
National Labor Relations
Board, for and on behalf of
the NATIONAL LABOR RELATIONS
BOARD,

        NO. 2:09-cv-0623 FCD DAD

        Petitioner,

    v.                   MEMORANDUM AND ORDER

THE FREMONT-RIDEOUT HEALTH
GROUP d/b/a FREMONT MEDICAL
CENTER AND RIDEOUT MEMORIAL
HOSPITAL,

        Respondent.

----oo0oo----

    This matter is before the court on petitioner Joseph P.
Norelli's, Regional Director of Region 20 of the National Labor
Relations Board, for an on behalf of the National Labor Relations
Board ("petitioner" or the "Board") petition for an injunction
under § 10(j) of the National Labor Relations Act. Respondent
The Fremont-Rideout Health Group ("respondent" or the "Employer")

oppose the petition. The court heard oral argument on April 7, 2009. For the reasons set forth below, the Board's petition for an injunction is GRANTED.

## BACKGROUND[1]

Respondent, a California non-profit corporation, operates acute care hospitals and other medical facilities in Yuba City and Marysville, California. (GC Exh. 1(p).) The California Nurses Association ("CNA" or the "Union") was certified on September 20, 2006, as the bargaining representative of a unit of approximately 450 registered nurses. (Tr. 12, 15.) On October 12, 2007, a decertification petition was filed by respondent's employees. (Tr. 23.) The petition was blocked by the Union's unfair labor practice charges until it was withdrawn on November 21, 2008. (Tr. 23.) The last bargaining session between the Employer and the Union occurred on January 8, 2008. (Tr. 23, 238, 242.) A strike was conducted on March 21, 2008. (Tr. 25.) As of May 21, 2008, the Union's last proposal to respondent was

---

[1] Petitioner filed a motion to try the petition for injunction on the basis of the administrative hearing record. (Pet'r. Mot. to Try Section 10(j) Inj. Pet. on Basis of Administrative Hr'g R. [Docket #6], filed Mar. 5, 2009.) Respondent did not file an opposition to the motion. Further, in its opposition, respondent provided that it did not "desire to present oral testimony at the hearing," and relies upon the administrative record in support of its submissions. (Resp't Opp'n to Pet. for Inj. ("Opp'n") [Docket #19], filed Mar. 23, 2009.) The court interprets this as a non-opposition to petitioner's motion. Therefore, petitioner's motion is GRANTED.

Reference to exhibits filed with this Court shall be made as follows: Exh. ___. References to exhibits received into the record before the ALJ shall be made as follows: GC Exh.___ or R Exh.___ or U Exh.___. References to the administrative transcript shall be as follows: Tr.___.

rejected, and the Employer stood on its last, best, and final offer, dated May 14, 2008. (Tr. 24, 298.)

On November 13, 2008, the Employer received evidence that the Union had lost majority status. (Tr. 237.) On November 14, 2008, the Employer withdrew recognition from the Union. (GC Exhs. 2, 3a, 3b.) The Employer based this withdrawal on a petition (the "anti-Union petition") signed by 234 registered nurses employed in the bargaining unit represented by the Union. (GC Exh. 2.) The 234 signatures represented 51.8% of the Unit, which was comprised of 452 employees at the time of the withdrawal of recognition. (Tr. 15-16.) 112 of these signatures were dated over seven months before the November 14 withdrawal; of those 112, 72 were dated over a year before the withdrawal. (GC Exh. 3b.) The Employer notified the Union that the anti-Union petition constituted evidence of CNA's loss of majority status and withdrew recognition of CNA as the exclusive representative of the bargaining unit, effective immediately. (GC Exh. 2.) On November 17, 2008, the Employer notified its employees of the withdrawal of the recognition. (GC Exh. 7.) In the same memo, respondent also informed employees of new beneficial working conditions. (GC Exh. 7.)

At the time it withdrew recognition, the Employer knew that revocations were being circulated by the Union. (Tr. 319.) However, the Union never informed the Employer that it any employee had signed "reaffirmation" documents. After the withdrawal of recognition, on December 15, 2008, petitioner informed the Employer that they were in possession of evidence regarding revocation of decertification signatures. (Tr. 287.)

3

The Union presented petitioner with cards from 18 petition signers revoking their signatures on the anti-Union petition and reaffirming their support for the Union. (GC Exhs. 13-30.) The Employer first saw these cards in the hearing before the Administrative Law Judge on February 23 and 24, 2008. The revocation cards are dated after the signers' respective signatures on the anti-Union petition and before the Employer's withdrawal of recognition. (GC Exhs. 13-30.) Without these 18 signatures, the petition supporting the withdrawal accounts for only 47.8% of the Unit.

The Union filed an unfair labor practice charge with petitioner on November 21, 2008, alleging an unlawful withdrawal of recognition due to the use of coercion in obtaining signatures. (R Exh. 7.) The Employer was faxed a copy of this charge on December 2, 2008. (R Exh. 7.) On December 12, 2008, the Employer sent its response to the charge to petitioner. (R Exh. 10.) On December 15, 2008, petitioner for the first time advised the Employer of any claimed revocation of signatures from the anti-Union petition. (Tr. 287.) Petitioner issued a complaint on December 23, 2008, alleging that the withdrawal of recognition was unlawful. (Exh. A.) The complaint was later consolidated with a separate charge that had been filed on December 16, 2008. (Exh. A; see Exhs. B-C.)

On February 23 and 24, 2008, the allegations in the consolidated complaint were fully litigated before Administrative Law Judge William N. Cates (the "ALJ"). (Exh. D.) The parties' briefs to the ALJ were filed on April 3, 2009. (Opp'n at 20 n.10.)

4

**ANALYSIS**

Section 10(j) of the National Labor Relations Act ("NLRA") provides that, upon issuance of a complaint charging an unfair labor practice, the Board may petition the appropriate United States district court for appropriate temporary relief or restraining order, and the court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) (2009). Injunctive relief under § 10(j) is intended to preserve the status quo pending final action by the Board. <u>Scott v. Stephen Dunn & Assocs.</u>, 241 F.3d 652, 660 (9th Cir. 2001).

In determining whether interim relief is "just and proper" under the NLRA, the court considers traditional equitable criteria in determining whether injunctive relief should be granted. <u>Miller v. Pac. Med. Ctr.</u>, 19 F.3d 449, 459 (9th Cir. 1994). The Ninth Circuit has recently clarified the controlling standard for injunctive relief in light of the Supreme Court's decision in <u>Winter v. Natural Res. Def. Council</u>, -- U.S. --, 129 S. Ct. 365 (2008). <u>Am. Trucking Ass'ns, Inc.</u>, -- F.3d --, No. 08-56503, 2009 WL 723992, at *4 (9th Cir. Mar. 20, 2009). A party seeking a preliminary injunction must demonstrate that he is likely to succeed on the merits, that irreparable harm is likely in the absence of preliminary relief, that the balance of equities tips in favor of such relief, and that an injunction is in the public interest. <u>Id.</u> However, when evaluating a petition under § 10(j), the court must analyze the request "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to

preserve the Board's remedial power while it processes the charge." <u>Miller</u>, 19 F.3d at 459-60.

"In assessing whether the Board has met its burden, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." <u>Id.</u> at 460 (citing <u>NLRB v. City Disposal Sys., Inc.</u>, 465 U.S. 822, 829 (1984) ("[O]n an issue that implicates [the Board's] expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference[.]"); <u>Ford Motor Co. v. NLRB</u>, 441 U.S. 488 (1979) ("Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute.").

**A.  Success on the Merits**

The district court must evaluate the likelihood of success in the context that the Board's determination on the merits will be given considerable deference on appeal. <u>Id.</u> "A conflict in evidence does not preclude the Regional Director from making the requisite showing for a § 10(j) injunction." <u>Scott</u>, 241 F.3d at 662; <u>see</u> <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d 33, 36-37 (2d Cir. 1975) (holding that where "there are disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief"). Moreover, the Ninth Circuit has instructed that "[e]ven on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." <u>Miller</u>, 19 F.3d at 460 (quoting <u>Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers'</u>

Union, 494 F.2d 1230, 1245 (2d Cir. 1974)).  On a motion for a 10(j) injunction, it is not the duty of the district court "to resolve the factual disputes or the legal issues involved.  Those are for the Board."  Kennedy v. Teamsters Local, 443 F.2d 627, 630 (9th Cir. 1971).  "In short, the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory."  Miller, 19 F.3d at 460.

### 1.  Withdrawal of Recognition

Petitioner asserts that it has demonstrated a likelihood of success on the merits because the Union had not actually lost the support of the majority of employees at the date of withdrawal. Specifically, petitioner asserts that 18 of the signatures on the anti-Union petition were revoked prior to the Employer's withdrawal of recognition.

"[A]n employer may unilaterally withdraw recognition from an incumbent union only where the union has actually lost the support of the majority of the bargaining unit employees." Levitz Furniture Co. of the Pacific, Inc., 333 NLRB 717, 717, 723 (2001).  In Levitz,[2] the Board adopted a more stringent standard

---

[2]    In Levitz, the employer received a petition bearing what it concluded to be the signatures of a majority of the unit employees, stating that they no longer desired to be represented by the union.  Id. at 719.  The next day, the employer informed the union that it had obtained objective evidence that the union no longer represented a majority and that it would be withdrawing recognition in two months.  Id.  Approximately two weeks later, the union informed the employer that it was disputing the claim. Id.  However, the employer subsequently withdrew recognition consistent with its prior notification.  Id.  The Board did not retroactively apply its holding to the facts presented by the case.  Id. at 729.  Because the employer had a good faith belief
(continued...)

for withdrawals of recognition.  _Id._ at 723.  In doing so, the
Board relied upon the fundamental policies of the NLRA,
specifically those underlying the presumption of continuing
majority status:  protecting employees right to choose or reject
collective-bargaining representatives; encouraging collective
bargaining; and promoting stability in bargaining relationships.
_Id._  In light of these underlying goals, the Board held that "an
employer who _withdraws_ recognition from an incumbent union, in
the honest but mistaken belief that the union has lost majority
support, should be found to violate Section 8(a)(5)."  _Id._ at
725.  Good faith is not a defense.  _Id._  The Board emphasized
"that an employer with objective evidence that the union has lost
majority support – for example, a petition signed by a majority
of the employees in the bargaining unit – withdraws recognition
at its peril."  _Id._  Further, the Board acknowledged that it
concluded "it entirely appropriate to place the burden of proof
on employers to show actual loss of majority support."  _Id._

The _Levitz_ decision also adopted a more lenient standard fo
obtaining an election in which the union's support will be tested
(an "RM election") in order to "provide a more attractive
alternative to unilateral action."  _Id._ at 723, 727.  By imposing
a more lenient standard, the Board underscored its position that
unilateral withdrawals of recognition "are not necessary to
ensure that employees can freely reject an incumbent union."  _Id._
at 724.  Rather, employees may file a decertification petition

---

        [2](...continued)
regarding the union's loss of majority status, the complaint was
dismissed.  _Id._ at 729-30.

with the Board or an employer may obtain an RM election upon a showing of good-faith uncertainty of majority support. Id. at 724, 727. The Board made clear that "Board-conducted elections are the preferred way to resolve questions regarding employees' support for unions." Id. at 717, 723 (noting that in the Board's view, RM elections are the most reliable measure of union support).

In this case, the Employer received the anti-Union petition on November 13, 2008. The Employer unilaterally withdrew recognition from the Union the following day, effective immediately. However, petitioner presents evidence that the anti-Union petition was not an accurate reflection of majority support because 18 of those signatures had been revoked prior to the withdrawal.

Respondent first contends that, even though it was aware that the Union was soliciting revocation cards, the unilateral withdrawal is effective because defendant was not presented with information about or evidence of the 18 revocation cards until December 15, 2008, a month after the withdrawal of recognition. However, the Levitz decision does not draw such a distinction. Rather, the Levitz Board specifically advised that an employer who is presented with a petition signed by a majority of the employees in the bargaining unit withdrawing support from the union unilaterally revokes recognition "at its peril." Id. at 725. Respondent's unilateral conduct was taken at its own risk.

The parties all agree that the majority of cases after Levitz have found an employer's withdrawal of recognition unlawful *after* it was first presented with evidence that cast

9

doubt upon the union's actual loss of majority status.  <u>See</u> <u>HQM</u>
<u>of Bayside, LLC</u>, 348 NLRB 758 (2006); <u>Highlands Req'l Med. Ctr.</u>,
347 NLRB 1404 (2006); <u>Parkwood Dev. Ctr., Inc.</u>, 347 NLRB 974
(2006).  However, in this case, respondent did not give the Union
time to present conflicting evidence.  Rather, it withdrew
recognition the day after it was presented with the anti-Union
petition.  <u>Cf.</u> <u>HQM of Bayside, LLC</u>, 348 NLRB at 758 (employer
notified union of its intention to withdraw recognition in one
month); <u>Highlands Req'l Med. Ctr.</u>, 347 NLRB at 1405(same);
<u>Parkwood Dev. Ctr., Inc.</u>, 347 NLRB at 974 (three months); <u>Levitz</u>,
333 NLRB at 719 (two months); HQM.  The Board's holding in <u>Levitz</u>
sought to discourage unilateral action by employers and encourage
use of the RM election process.  <u>See</u> 333 NLRB at 727.  To reward
an employer for immediately engaging in unilateral action without
any notice to the union of its intention is contrary to the
teachings of the Board in <u>Levitz</u>.  <u>See</u> <u>Muffley v. APL Logistics</u>
<u>Mgmt. Warehouse Servs., Inc.</u>, No. 3:08cv-26, 2008 WL 544455 (W.D.
Ky. Feb. 27, 2008, at *5 (holding that it is irrelevant whether
the evidence that renders the withdrawal unlawful is in the
employer's possession at the time of withdrawal because "case law
makes it clear that an employer bears the risk of withdrawing
recognition from the union").  Therefore, respondent's asserted
lack of actual notice or possession of the revocation cards does
not defeat petitioner's likelihood of success on the merits.[3]

---

[3]     The court also notes that respondent's argument based
upon "recognition" cases, which was expounded upon during oral
argument, does not defeat petitioner's likelihood of success on
the merits.  The Board has made specific findings with respect to
(continued...)

10

Respondent next contends that "credibility issues abound" regarding the authenticity and timing of the revocation cards and that such issues prevent petitioner from meeting its burden. (Opp'n at 11.) The court disagrees. As an initial matter, the district court does not resolve factual disputes on a § 10(j) petition. Rather, the petitioner must merely produce some evidence that supports the unfair labor charge. The court concludes that petitioner easily meets this burden.

At the administrative hearing, petitioner presented evidence regarding the 18 revocation cards; nine were introduced and authenticated by the solicitors and nine by the card signers. Respondent contends that there is "no easy explanation" as to why all nine card signers were not called. (Opp'n at 11). However, the Board has held that "witnesses to the signing of authorization cards are competent to testify as to the attending circumstances and manner in which the cards are signed," Don the Beachcomber, 163 NLRB 275 n.2 (1967); that the actual card signers did not testify does not necessarily cast doubt upon the veracity of the solicitors' testimony. This is particularly true where one card signer testified that she only signed the anti-Union petition because she was scared she would be fired if she

<hr>

[3](...continued)
unilateral withdrawals of recognition, and the court does not find cases outside of this context persuasive to an analysis of the issues before it. In particular, the Levitz Board based its reasoning on principles relating to the presumption of continuing majority support and its incumbent promotion of continuity in bargaining relationships and protection of the right of employees to designate a collective-bargaining representative. 333 NLRB at 723. Such a presumption does not similarly apply in recognition cases because there has not been a prior bargaining relationship between the parties. See id.

did not. (Tr. 145). Furthermore, even if the court only
credited the testimony of the nine card signers, the signatures
on the anti-Union petition would reflect only 49.8% of the unit,
less than a majority.

Respondent also contends that time cards presented by the
Employer create credibility issues because cards were signed and
dated by employees who allegedly did not work on that day.
However, not all employees testified that they were working when
they signed the card. Furthermore, there appears to be other
discrepancies with the time cards which might demonstrate they
are not an accurate reflection of the actual hours worked by
employees. (See Reply, filed Mar. 30, 2009, at 4).

Finally, respondent alleges that cross-examination, as well
as inconsistencies between witness testimony, reveal general
credibility issues. However, the court has reviewed the
transcript of the administrative hearing in its entirety and
finds that none of the testimony or alleged conflicting
statements undermines petitioner's likelihood of success on the
merits. Cf. McDermott v. Peyton Cramer, Inc., No. cv 06-4618,
2006 WL 2859314, at *4 (C.D. Cal. Sept. 26, 2006) (holding that
credibility issues arising from sharply conflicting affidavits
and the timing of the interview at issue severely undermined
petitioner's likelihood of success on the merits) vacated by 2007
WL 1839332 (C.D. Cal. June 26, 2007).[4]

---

[4]   Respondent cites Aquayo v. S&F Market Street Healthcare
LLC, 2006 WL 941183, at *8 (C.D. Cal. Mar. 22, 2006), for the
proposition that district courts may consider witness credibility
in evaluating likelihood of success on the merits. However, in
(continued...)

Having reviewed the administrative record and the submissions of the parties, the court finds that petitioner has presented evidence of an unfair labor practice with a more than arguable legal theory. As such, petitioner has demonstrated a likelihood of success on the merits based upon the 18 revocation cards signed prior to withdrawal of recognition.

**2. "Staleness" of the Signatures**

Petitioner also asserts that it has demonstrated a likelihood of success on the merits because many of the signatures on the anti-Union petition relief upon by respondent were stale. Specifically, petitioner asserts that 112 of the signatures were over seven months old and that, of those 112, 72 were over a year old.

The Board has considered the "staleness" of signatures in analyzing the validity of unilateral withdrawals of recognition. In <u>Metro Health, Inc.</u>, the petition that served as the basis for withdrawal was executed seven months before the withdrawal of recognition. 334 NLRB 555, 556 (2001). Although this evidence was considered in light of significant changed circumstances between the petition and the withdrawal, the Board noted that "such stale evidence is not a reliable indicator of the employees' union sentiments at the time recognition was withdrawn." <u>Id.</u> Likewise in <u>Ferri Supermarkets, Inc.</u>, the Board noted that a petition was over a year old at the time of

---

[4](...continued)
<u>Aguayo</u>, the court noted that the only evidence offered by Respondent was discredited by both the court and the ALJ. As set forth, *supra*, the deference owed to the Board is greater than that owed a respondent on a § 10(j) petition.

withdrawal, and held that "for that reason could not reasonably be relied on as an accurate reflection of the employees' sentiments" at the time of withdrawal.  330 NLRB 1119, 1120 (2000).  But see McDonald Partners, Inc. v. NLRB, 331 F.3d 1002 (D.C. Cir. 2003) (finding that evidence up to two years old was not necessarily unreliable and noting that "[t]he Board has never dismissed evidence as stale based solely on its age.").[5]

The parties do not dispute the facts surrounding the age of the signatures.  Rather, respondent takes issue with the legal theory advanced by petitioner.  The court finds that this is a novel legal theory because petitioner seeks to expand Board precedent; while the language of the Board decisions relied upon by petitioner do not indicate that staleness by itself would be insufficient, the facts of these cases present more than simply age of signatures in support of the conclusions.[6]  However, on an issue of law raised in a 10(j) petition, "the district court should be hospitable to the views of the General Counsel, however novel."  Miller, 19 F.3d at 460.  The language of the Board decisions cited by petitioner support its assertion that staleness is an arguable legal theory.

---

[5]    The Board is not bound to follow Circuit court decisions in order to endure uniform administration of the NLRA. Armco Steel Corp., 183 NLRB 207 (1970).

[6]    Contrary to respondent's assertion, the court does not find that petitioner's theory is contrary to current Board precedent.  See Metro Health, 334 NLRB 555; Ferri Supermarkets, 330 NLRB 1119; cf. Poray, Inc., 160 NLRB 697 n.1 (1966) (holding that under the good faith doubt standard overruled by Levitz, the employee had reasonable grounds to believe the union had lost majority status based upon signatures on an anti-union petition signed two years prior to withdrawal of recognition in conjunction with various meet and confer sessions and the employer's petition for an election).

14

As such, petitioner has presented, at the very least, a fair chance of success on the merits, with respect to its claim that withdrawal of recognition was invalid because the signatures were stale.

**B.  Irreparable Harm**

The Ninth Circuit has held that "if the Board demonstrates that it is likely to prevail on the merits, [the court] presume[s] irreparable injury." <u>Miller</u>, 19 F.3d at 460. However, "[i]f the Board has only a fair chance of succeeding on the merits, the court must consider the possibility of irreparable injury." <u>Id.</u> Although the applicability of its holding to § 10(j) petitions is unclear, the court is also mindful of the Supreme Court's decision in <u>Winter</u>, expressly adopted by the Ninth Circuit in <u>American Trucking</u>, requiring that the moving party demonstrate a likelihood of irreparable injury in order to obtain injunctive relief. <u>Winter</u>, -- U.S. --, 129 S. Ct. 365 (2008); <u>Am. Trucking Ass'ns, Inc.</u>, -- F.3d --, No. 08-56503, 2009 WL 723992, at *4 (9th Cir. Mar. 20, 2009).  As such, despite finding that petitioner has demonstrated a likelihood of success on the merits with respect to at least one of its theories, the court will also consider the likelihood of irreparable injury.

The Ninth Circuit has noted that "the passage of the statute is itself an implied finding by Congress that violations will harm the public." <u>Id.</u> at 459.  Further, the court "must take into account the probability that declining to issue the injunction will permit the unfair labor practice to reach

15

fruition and thereby render meaningless the Board's remedial authority." Id. at 460.

In light of the implicit finding by Congress and the evidence set forth in the administrative record, petitioner has demonstrated that irreparable injury is likely to occur in the absence of injunctive relief, including an interim bargaining order. First, there is no evidence that the employees have had a bargaining representative since the unilateral withdrawal of recognition. However, respondent has instituted unilateral changes to the working conditions. (Tr. 18-19, 24-25; GC Exhs. 7-8); see Morio v. N. Am. Soccer League, 632 F.2d 217, 218 (2d Cir. 1980) (revoking certain unilateral changes in employment conditions based upon a finding that the union's prestige and legitimacy with its members had been severely eroded by the respondent's conduct, which included unilateral changes). Second, one of these unilateral changes was restriction on the Union's access to the sidewalk on the Employer's property and in the cafeteria. (Tr. 19.) Such a restriction further impedes confidence in the Union because access to communication is more difficult. See Kobell v. Beverly Heath and Rehab. Servs., 987 F. Supp 409, 416 (W.D. Pa. 1997) (granting a § 10(j) petition where the employer's alleged unfair labor practices were selectively geared to destroy or at least impede the communication network among union members, including the removal of bulletin boards and rescheduling of shifts). Third, in its memorandum to employees announcing the withdrawal of recognition, dated November 17, 2008, respondent announced improvement in wages and benefits, implying that such conditions were not possible during

16

negotiations with the Union.  (GC Exh. 8) ("We are very grateful for the opportunity to once again work and communicate directly with our nursing staff at the hospitals.  We are moving forward to ensure the competitiveness of out wage and benefit programs and help build a strong relationship built on open dialogue and trust.  We are delighted to let you know of the many positive wages, benefits and programs that are available for our registered nurses at the hospitals and all non-bargaining units.").  The implication that benefits were withheld because of the Union's representation further impedes the collective bargaining process.  This is troubling where, as set forth above, petitioner has demonstrated it is likely that the Union retained majority status despite the Employer's withdrawal of recognition.[7]

        Moreover, courts have historically held that withdrawal of union recognition is often irreparable.  <u>See</u> <u>Int'l Union of Elec., Radio & Machine Workers v. NLRB</u>, 426 F.2d 1243, 1249 (D.C. Cir. 1970)("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.  When the company is finally ordered to bargain with the union some years later, the union may find it represents only a small fraction of employees."); <u>Reichard v. Foster Poultry Farms</u>, 425 F. Supp. 2d 1090, 1100 (E.D. Cal. 2006).  Specifically, the Supreme Court has noted, "Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with

_____

        [7]    This is also troubling given that an ALJ has recently found that the Employer engaged in an unfair labor practice.

its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." <u>Franks Bros. Co. v. NLRB</u>, 321 U.S. 702, 704 (1944).

Therefore, petitioner has demonstrated a likelihood of irreparable injury in the absence of injunctive relief.[8]

**C.   The Balance of Hardships and Public Interest**

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.  Thus, courts must consider the extent to which this interest is implicated under the circumstances of the particular case." <u>Miller</u>, 19 F.3d at 460.  In this case, petitioner has presented evidence that the Union retained majority status, but that it has been unable to represent its members.  As such, the public interest is served by recognizing the Union as the collective bargaining representative pending ultimate determination of the alleged unfair labor practices.

In weighing the balance of hardships, the court must similarly take into account the probability that declining to enter an injunction will render meaningless the Board's remedial authority.  <u>Id.</u>  The balance of hardships in this case can be stated succinctly.  Respondent unilaterally withdrew recognition

---

[8]    The court also finds the respondent's contention that the petition is untimely or that petitioner unduly delayed is without merit.  Two charges were filed in this action, which were ultimately consolidated on February 4, 2009.  Petitioner sought an expedited hearing, held on February 23 and 24, 2009, which was the factual basis for the petition.  The petition itself was filed on March 5, 2009.  These facts do not undermine petitioner's proffered need for relief.

18

that day after it received the anti-Union petition, effective

immediately. Petitioner has presented evidence that the Union

retained majority support and that the unilateral withdrawal was

improper. Subsequently, respondent has imposed unilateral

changes to working conditions[9] when the employees have not been

represented by anyone in a bargaining process. This is a

significant hardship that greatly outweighs respondent's

obligation to recognize and negotiate with the Union, pending

determination of the NLRB's complaint. See Reichard, 425 F.

Supp. 2d at 1103.

As such, the court finds that the public interest and the

balance of hardships weighs in favor of granting the § 10(j)

petition.

### INJUNCTION

For the foregoing reasons, the Board's petition is GRANTED.

It is hereby

ORDERED, ADJUDGED AND DECREED that, pending the final

disposition of matters now pending before the National Labor

Relations Board, Respondent, its officers, representatives,

supervisors, agents, servants, employees, attorneys, and all

persons acting on its behalf or in participation with it, be, and

they hereby are, enjoined and restrained from:

(a) withdrawing recognition from the Union as the exclusive

collective-bargaining representative of Respondent's

---

[9] Respondent has not proffered any evidence demonstrating
how rescission of these unilateral changes will disrupt its
operation. Moreover, petitioner asserts that although the Union
is entitled to request rescission, because many of the changes
are improvements for it members, it is unlikely that the Union
will request such relief. (Reply at 11.)

1      employees in the appropriate bargaining unit, described

2      below;

3  (b)  refusing to meet and bargain with the Union as the

4      exclusive collective-bargaining representative of

5      Respondent's employees in the appropriate bargaining

6      unit described below with respect to rate of pay, hours

7      of employment, and other terms and conditions of

8      employment;

9  (c)  unilaterally implementing changes to terms and

10      conditions of employment for employees in the

11      appropriate bargaining unit, described below; and

12  (d)  in any like or related manner interfering with,

13      restraining or coercing employees in the exercise of

14      the rights guaranteed them by Section 7 of the NLRA.

15  It is further

16      ORDERED, ADJUDGED AND DECREED that, pending the final

17  disposition of the matters herein now pending before the National

18  Labor Relations Board, Respondent, its officers, representatives,

19  supervisors, agents, servants, employees, attorneys and all

20  persons acting on its behalf or in participation with it, shall

21  take the following affirmative steps:

22  (a)  Recognize the Union as the exclusive collective-

23      bargaining representative of the employees in the

24      following appropriate bargaining unit, herein called

25      the Unit:

26          All full-time and regular part-time and per diem

27          Registered Nurses in positions requiring a

28          Registered Nurse (RN) license and who provide

20

direct patient care and are employed by Respondent
at and out of Fremont Medical Center located at
970 Plumas Street, Yuba City, CA and/or Rideout
Memorial Hospital located at 726 Fourth Street,
Marysville, California; excluding all non-
professional employees, non-Registered Nurses,
Traveler Registered Nurses, Registry Registered
Nurses, Care Coordinators (discharge planning),
Physician's Assistants (PAs), RN Clinical Systems
Analysts, RN Program Coordinators (in Cardiac
Rehab), RN Focus Review Patient Account Nurse
Auditors, RN Focus Review Medical Records
Analysts, ICU Outcome Coordinators, RN Education
Coordinators, Clinical Nurse Specialists,
Infection Control Nurses, RN midwives, managerial
employees, confidential employees, guards and
supervisors as defined in the Act.

(b)  Bargain collectively with the Union as the exclusive
representative of the employees in the Unit with
respect to wages, hours and other terms and conditions
of employment and, if an agreement is reached, embody
it in a signed document;

(c)  Upon the request of the Union, rescind any or all
changes to terms and conditions of employment
implemented after the Respondent's November 14, 2008
withdrawal of recognition;

(d)  Post copies of the District Court's opinion and order,
in English, at its facilities in all places where

1    notices to its employees are normally posted; maintain
2    these postings during the Board's administrative
3    proceeding free from all obstructions and defacements;
4    grant all employees free and unrestricted access to
5    said postings; and grant to agents of the Board
6    reasonable access to its facilities to monitor
7    compliance with this posting requirement; and

8    (e)  Within twenty (20) days of the issuance of the District
9    Court's Decision and Order, file with the District
10   Court and serve upon the Regional Director of Region 20
11   of the Board, a sworn affidavit from a responsible
12   official describing with specificity the manner in
13   which Respondent has complied with the terms of the
14   Court's decree, including the locations of the posted
15   documents.

16   IT IS SO ORDERED.
17   DATED: April 7, 2009

18                              _____
19                              FRANK C. DAMRELL, JR.
                               UNITED STATES DISTRICT JUDGE
20
21
22
23
24
25
26
27
28

                               22